PAUL L. MORE, Bar No. 228589
pmore@msh.law
LUKE DOWLING, Bar No. 328014
ldowling@msh.law
McCracken, Stemerman & Holsberry, LLP
595 Market Street, Suite 800
San Francisco, CA 94105
Telephone: (415) 597-7200
Facsimile: (415) 597-7201

*Attorneys for Intervenor United Food &*
*Commercial Workers Local 324*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA GROCERS ASSOCIATION, a California non-profit organization, | Case No.  21-cv-00524-ODW-AS |
| Plaintiff, | **INTERVENOR UNITED FOOD & COMMERCIAL WORKERS LOCAL 324's MOTION TO DISMISS** |
| v. | **[Fed. R. Civ. P. 12(b)(6)]** |
| THE CITY OF LONG BEACH, a charter municipality, | **Judge: Hon. Otis D. Wright II** |
| Defendants, | **Date: March 22, 2021** |
| | **Time: 1:30 PM** |
| | **Location: Courtroom 5D** |
| UNITED FOOD & COMMERCIAL WORKERS LOCAL 324 | |
| Intervenor. | |

# MOTION TO DISMISS

TO ALL PARTIES AND ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on March 22, 2021, at 1:30 p.m., or as soon thereafter as the Court may schedule hearing, United Food & Commercial Workers Local 324 (the "Union") will and hereby does move the Court to dismiss the Complaint in this action pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff California Grocers Association's Complaint fails to state a claim for relief because (1) the City of Long Beach's "Premium Pay for Grocery Store Workers Ordinance" (the "Ordinance") is not preempted under the *Machinists* doctrine of federal labor-law preemption because it does not regulate the process of collective bargaining; (2) the Ordinance does not violate the Contracts Clauses of the U.S. or California Constitutions because it does not substantially impair any of CGA members' employment contracts or collective bargaining agreements, and is, in any case, reasonably based; and (3) the Ordinance does not violate the U.S. or California Equal Protection Clauses because it does not implicate any fundamental right and readily passes rational-basis review.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on January 29, 2021.

This motion is based on the accompanying Memorandum of Points and Authorities, on the full records in this matter, and on such further briefing and argument as the Court may allow.


Dated: February 17, 2021                                    */s/Paul L. More*
                                                            Paul L. More

PAUL L. MORE, Bar No. 228589
pmore@msh.law
LUKE DOWLING, Bar No. 328014
ldowling@msh.law
McCracken, Stemerman & Holsberry, LLP
595 Market Street, Suite 800
San Francisco, CA 94105
Telephone: (415) 597-7200
Facsimile: (415) 597-7201

*Attorneys for Intervenor United Food &
Commercial Workers Local 324*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA GROCERS ASSOCIATION, a California non-profit organization,<br><br>        Plaintiff,<br><br>v.<br><br>THE CITY OF LONG BEACH, a charter municipality,<br><br>        Defendants.<br><br>―――――――――――――<br><br>UNITED FOOD & COMMERCIAL WORKERS LOCAL 324<br><br>        Intervenor. | Case No.  21-cv-00524<br><br>**INTERVENOR UNITED FOOD & COMMERCIAL WORKERS LOCAL 324's MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**<br><br>**Judge: Hon. Otis D. Wright II**<br><br>**Date: March 22, 2021**<br><br>**Time: 1:30 PM**<br><br>**Location: Courtroom 5D**<br><br><br>**[Fed. R. Civ. P. 12(b)(6)]** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

STATEMENT OF FACTS ..................................................................................3

ARGUMENT ......................................................................................................5

I.    The Ordinance is not preempted by the NLRA......................................5

    A.   *Machinists* preemption applies to state laws that regulate the bargaining process, not substantive employment protections. ....................................5

    B.   The Ordinance establishes a substantive labor standard and does not regulate the collective-bargaining process. ...................................................9

    C.   *Chamber of Commerce v. Bragdon* does not apply to the Ordinance. ...........13

II.    The Ordinance does not violate the Contracts Clauses of either the United States or California Constitutions. .............................................................16

    A.   The Ordinance does not substantially impair the terms of any employment contract or collective bargaining agreement.........................................18

    B.   Even if it substantially impaired CGA members' contracts, the Ordinance has a reasonable public purpose. ...................................................................20

III.    The Ordinance does not violate the U.S. or California Equal Protection Clause. ...........................................................................................................21

    A.   There is no fundamental "freedom to contract.".............................................21

    B.   The Ordinance is subject to rational-basis review. ........................................22

    C.   The Ordinance is a rational response to the COVID-19 pandemic. ..............23

CONCLUSION .................................................................................................26

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                    **Page(s)**

*520 S. Michigan Ave. Assocs., Ltd. v. Shannon*,
    549 F.3d 1119 (7th Cir. 2008) ........................................................10, 15

*Allied Concrete & Supply Co. v. Baker*,
    904 F.3d 1053 (9th Cir. 2018) ...............................................................22

*Allied Structural Steel Co. v. Spannaus*,
    438 U.S. 234 (1978)................................................................................21

*Am. Hot. & Lodg. Ass'n v. City of L.A.*,
    119 F.Supp.3d 1177 (C.D. Cal. 2015) ........................................ 5, 13, 16

*Am. Hotel & Lodg. Ass'n v. City of L.A.*,
    834 F.3d 958 (9th Cir. 2016) ........................................................ *passim*

*Ass'n of Surrogates & Supreme Court Reporters Within City of N.Y. v.
    State of N.Y.*,
    940 F.2d 766 (2d Cir. 1991) ...................................................................18

*Assoc. Builders & Contractors of Cal. Cooperation Comm., Inc. v.
    Becerra*,
    231 F. Supp. 3d 810 (S.D. Cal. 2017).....................................................15

*Assoc. Builders & Contractors of So. Calif. v. Nunn*,
    356 F.3d 979 (9th Cir. 2004) ........................................................ *passim*

*Biggs v. Best, Best & Krieger*,
    189 F.3d 989 (9th Cir. 1999) ..................................................................13

*Burnside v. Kiewit Pac. Corp.*,
    491 F.3d 1053 (9th Cir. 2007) ...................................................... 6, 13, 19

*Cal. Grocers Ass'n v. City of Los Angeles*,
    52 Cal.4th 177 (2011) ......................................................................10, 15

*California Grocers Association v. City of Montebello*,
    Case No. 21-cv-01011-FLA-AGR (C.D. Cal.)..........................................5

*California Grocers Association v. City of Oakland*,
   Case No. 21-cv-00863-DMR (N.D. Cal.) .............................................5

*California Hotels & Lodging Ass'n v. City of Oakland*,
   393 F. Supp. 3d 817 (N.D. Cal. 2019) ...........................................11

*Calop Bus. Sys., Inc. v. City of Los Angeles*,
   984 F. Supp. 2d 981 (C.D. Cal. 2013), *aff'd in part, appeal dismissed in part*, 614 F. App'x 867 (9th Cir. 2015) ..................................14

*Chamber of Commerce v. Bragdon*,
   67 F.3d 497 (9th Cir. 1995) .............................. 13, 14, 15, 16

*Chicago Bd. of Realtors, Inc. v. City of Chicago*,
   819 F.2d 732 (7th Cir. 1987) .......................................18, 22

*Columbia Sussex Mgmt., LLC v. City of Santa Monica*,
   No. 19-CV-09991ODWSKX, 2020 WL 5358505 (C.D. Cal. Aug. 28, 2020 ...........................................................8, 11

*Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*,
   459 U.S. 400 (1983) ....................................... *passim*

*Exxon Corp. v. Eagerton*,
   462 U.S. 176 (1983) ...................................................17

*FCC v. Beach Commc'ns, Inc.*,
   508 U.S. 307 (1993) .................................. 22, 24, 25

*Fort Halifax Packing Co. v. Coyne*,
   482 U.S. 1 (1987) .......................................... *passim*

*Fortuna Enter. L.P. v. City of Los Angeles*,
   673 F.Supp.2d 1000 (C.D. Cal. 2008) ............................ *passim*

*Golden State Transit Corp. v. City of Los Angeles*,
   475 U.S. 608 (1986) ...................................................5

*Guggenheim v. City of Goleta*,
   638 F.3d 1111 (9th Cir. 2010) ......................................25

*Indus. Truck Ass'n, Inc. v. Henry*,
   125 F.3d 1305 (9th Cir. 1997) ......................................5

iii

*Int'l Franch. Ass'n, Inc. v. City of Seattle,*
   803 F.3d 389 (9th Cir. 2015) ............................................................2, 22

*Int'l Paper Co. v. Town of Jay,*
   928 F.2d 480 (1st Cir. 1991)....................................................................12

*Iqbal v. Ashcroft,*
   556 U.S. 662 (2009).................................................................................18

*Johnson v. Rancho Santiago Cmty. Coll. Dist.,*
   623 F.3d 1011 (9th Cir. 2010) ..........................................................12, 24

*Kyne v. Ritz-Carlton Hotel Co.,*
   835 F.Supp.2d 914 (D. Haw. 2011).........................................................8

*Lodge 76, Int'l Ass'n of Machinists v. Wisc. Emp't Relations Comm'n,*
   457 U.S. 132 (1976)........................................................... *passim*

*Metro. Life Ins. Co. v. Mass,*
   471 U.S. 724 (1985)........................................................... *passim*

*N. Ill. Chapter of Assoc. Builders and Contractors, Inc. v. Lavin,*
   431 F.3d 1004 (7th Cir. 2005) ................................................................12

*Nat. Broad. Co. v. Bradshaw,*
   70 F.3d 69 (9th Cir. 1995) ......................................................... 8, 10, 13

*Nebbia v. N.Y.,*
   291 U.S. 502 (1934)..................................................................................2

*Olson v. California,*
   No. CV1910956DMGRAOX, 2020 WL 5572 (C.D. Cal. Feb. 10,
   2020) .......................................................................................................21

*Olson v. California,*
   No. CV1910956DMGRAOX, 2020 WL 6439166 (C.D. Cal. Sept.
   18, 2020) .................................................................................................20

*Prime Healthcare Servs., Inc. v. Harris,*
   216 F. Supp. 3d 1096 (S.D. Cal. 2016) ..................................................12

*Rondout Elec., Inc. v. NYS Dep't of Labor,*
   335 F.3d 162 (2d Cir. 2003) ...................................................................15

*RUI One Corp. v. City of Berkeley*,
　371 F.3d 1137 (9th Cir. 2004) .................................................................. *passim*

*Sonoma Ct. Org. of Pub. Employees v. City of Sonoma*,
　23 Cal.3d 296 (1979) .......................................................................................20

*St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin
　Islands*,
　218 F.3d 232 (3d Cir. 2000) ...........................................................................15

*Stanley v. Gonzales*,
　476 F.3d 653 (9th Cir. 2007) ..........................................................................13

*Teamsters v. Morton*,
　377 U.S. 252 (1964)............................................................................................6

*United States Trust Co. v. New Jersey*,
　431 U.S. 1 (1977).............................................................................................19

*Viceroy Gold Corp. v Aubry*,
　75 F.3d 482 (9th Cir. 1996) .........................................................................8, 10

*Wadsworth v. KSL Grand Wailea Resort, Inc.*,
　818 F. Supp. 2d 1240 (D. Haw. 2010).............................................................8

*West Coast Hotel Co. v. Parrish*,
　300 U.S. 379 (1937)....................................................................................2, 21

*Woodfin Suite Hotels LLC v. City of Emeryville*,
　No. 06-cv-1254-SBA, 2006 WL 2739309 (N.D. Cal. Aug 23, 2006) ...................23

**Constitutional Provisions**

U.S. Const. amend. I ................................................................................13

U.S. Const. amend. XIV ...........................................................................22

**Federal Statutes**

5 U.S.C. § 7511(b)(2)................................................................................13

**State Statutes**

Cal. Labor Code §510 ...............................................................................24

v

Cal. Labor Code §§858, 860 ..................................................................11

Cal. Lab. Code §1060 ..........................................................................12

Cal. Labor Code §1182.12 ....................................................................20

Cal. Lab. Code §2502 ....................................................................12, 20

Cal. Labor Code §2922 ..........................................................................7

**Federal Rules of Civil Procedure**

Federal Rule of Civil Procedure 12(b)(6) ............................................1, 2

**Other Authorities**

Cal. Dept. of Industrial Relations, "Cal/OSHA Issues Citations to
  Grocery Stores for COVID-19 Violations" (Sept. 30, 2020) .................23

Cal. Dept. of Industrial Relations, "COVID-19 Infection Prevention in
  Grocery Stores" (October 27, 2020) .................................................24

Centers for Disease Control and Prevention, "What Grocery and Food
  Retail Workers Need to Know about COVID-19" (Nov. 12, 2020) ......23

Lan F-Y, Suharlim C, Kales SN, *et al*. "Association between SARS-
  CoV-2 infection, exposure risk and mental health among a cohort of
  essential retail workers in the USA," OCCUP. ENVIRON. MED. (Oct.
  30, 2020) ......................................................................................3

Molly Kinder, Laura Stateler, and Julia Du, "Windfall profits and deadly
  risks: How the biggest retail companies are compensating essential
  workers during the COVID-19 pandemic," BROOKINGS INSTITUTE
  (NOVEMBER 2020) ..........................................................................3

Suhanna Hussein, "Ralphs and Food 4 Less set to close in Long Beach.
  They blame hazard pay ordinance," LA TIMES (Feb. 1, 2021) (Feb. 1,
  2021) ............................................................................................4

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
Case No. 21-cv-00524-ODW-AS

**INTRODUCTION**

California deems grocery store workers to be "essential" because of the critical role they play in the State's food system during the COVID-19 pandemic. These workers face significant risks on the job, and for a time during the pandemic's early phases, many grocery companies provided them with "hero" or "hazard" pay to acknowledge these risks. Many of those same companies have seen significant increases in revenues and profits during the pandemic, as restaurants and other retail food sources have closed. Yet most companies phased out the additional compensation that they paid their frontline workers last year, even as COVID-19 cases surged in Southern California. In response, the City of Long Beach passed the "Premium Pay for Grocery Store Workers Ordinance" ("Ordinance"). The Ordinance mandates that large grocery stores in the City pay their non-supervisory workers an additional four dollars per hour to compensate them for working in close proximity to the public, many of whom may be carrying a contagious and often deadly virus.

The California Grocers Association ("CGA") asks the Court to strike down the Ordinance for reasons that the Supreme Court and Ninth Circuit have rejected for decades. First, the CGA claims that the Ordinance is preempted under the *Machinists* doctrine of federal labor preemption because it purportedly interferes with grocery companies' union negotiations. But federal labor law does not preempt state substantive employment standards because those standards do not regulate the process of collective bargaining. *See, e.g. Metro. Life Ins. Co. v. Mass*, 471 U.S. 724, 753 (1985); *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 19–20 (1987); *Am. Hotel & Lodg. Ass'n v. City of L.A.*, 834 F.3d 958, 963–65 (9th Cir. 2016); *Assoc. Builders & Contractors of So. Calif. v. Nunn,* 356 F.3d 979, 990 (9th Cir. 2004).

Next, the CGA claims the Ordinance violates the U.S. and California Contract Clauses. CGA does not adequately plead this theory, failing to identify which contractual terms the Ordinance supposedly impairs. Even if it had, a state or municipal wage mandate does not "substantially impair" an employment contract to

---

1

pay something inferior.  *See Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–12 (1983).  If that were the law, the government would have no ability to set minimum wages, overtime, vacation pay, or rest breaks, because an employer could simply point to an employment agreement in which it contracted to pay less.  Even if there some basis for arguing that the Contracts Clause is implicated by a wage requirement, the Ordinance meets the deferential standard of review that applies to economic regulations that impair purely private contracts.  *Id*. at 412-13.

Finally, the CGA argues that the Ordinance violates the U.S. and California Equal Protection Clauses.  Faced with California and Ninth Circuit precedent holding that classifications like those in the Ordinance are perfectly constitutional under rational-basis review, CGA argues that the Ordinance is subject to strict scrutiny because it violates companies' "fundamental right" to contract freely.  Even though it has no legitimate contracts-clause claim, CGA argues that merely asserting that its existing contracts are "implicated" by economic regulation is sufficient to require strict scrutiny under the Equal Protection Clause.  Doc. 26, at 12.  Courts rejected this notion when they discarded *Lochner*-era substantive due-process doctrine.  *See West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 391–99 (1937) ("The Constitution does not speak of freedom of contract."); *Nebbia v. N.Y.*, 291 U.S. 502, 523 (1934) ("[N]either property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm.").

Economic regulations like the Ordinance are subject to rational-basis review.  *See, e.g.*, *Int'l Franch. Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 407 (9th Cir. 2015); *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1154 (9th Cir. 2004).  There are obvious rational bases for the Ordinance's classifications and requirements.

The Court should dismiss CGA's complaint under Rule 12(b)(6) for failure to state a claim.

## STATEMENT OF FACTS

Grocery store employees are "essential workers" in California, but many employers have not treated them that way. Grocery workers face significant risks of contracting COVID-19 due to their regular customer contact and the difficulty in maintaining social distancing in retail stores.[1]  At the outset of the pandemic, many grocery chains introduced temporary "hazard" (or "appreciation" or "hero") pay for their frontline workers, generally a small premium on hourly wages.  By the summer, however, as the first wave of the pandemic waned, most discontinued the pay: "As nonessential businesses reopened in May and June, retail employers signaled they were returning to 'normal'—just weeks before COVID-19 cases spiked during a second peak."[2]  Even as they reneged on their commitment to workers on the pandemic's frontlines, major grocery store chains were enjoying significant increases in profits, as restaurants and other retail food venues shut down.[3]

Municipal governments in California have stepped in to require large grocery companies to compensate their employees for the risks that they are taking on our behalf.  On January 19, 2021, the City passed the Ordinance, the first of many in California.  The Ordinance requires covered grocery stores to provide their non-

---

[1] *See* Lan F-Y, Suharlim C, Kales SN, *et al.* "Association between SARS-CoV-2 infection, exposure risk and mental health among a cohort of essential retail workers in the USA," OCCUP. ENVIRON. MED. (Oct. 30, 2020) (finding that grocery-store workers with customer contact were five times more likely to contract COVID than those who did not have customer contact and that 20% of sampled grocery workers had the virus), available at: https://oem.bmj.com/content/oemed/early/2020/10/11/oemed-2020-106774.full.pdf.

[2] Molly Kinder, Laura Stateler, and Julia Du, "Windfall profits and deadly risks: How the biggest retail companies are compensating essential workers during the COVID-19 pandemic," BROOKINGS INSTITUTE (November 2020), available at: https://www.brookings.edu/essay/windfall-profits-and-deadly-risks/

[3] *Ibid.* (finding that Krogers experienced a 90% increase in profits over 2020 and that Albertson's saw a 153% increase, far higher than the average increase for all retailers analyzed by the Brookings Institute researchers).

supervisory workers an hourly wage premium of four dollars.  Ordinance, §5.91.050.
It covers grocery employers with 300 or more employees nationwide and an average of
fifteen employees in stores in the City.  *Id.* at § 5.91.040.

The Ordinance's intent is to "compensate[] grocery store workers for the risks of
working during a pandemic[,]" as such workers face "magnified risks of catching or
spreading the COVID-19 disease because the nature of their work involves close
contact with the public[.]"  *Id.* at §5.91.005.  Mandating higher pay also "ensures the
retention of these essential workers who are on the frontlines of this pandemic
providing essential services and who are needed throughout the duration of the
COVID-19 emergency." *Id.*

The City Council passed the Ordinance as an emergency measure so that it
would take effect immediately, and the Ordinance expires after 120 days unless the
City extends it.  *Id.* at §5.91.050(C).  In order to ensure that workers actually benefit
from the additional pay, the Ordinance prohibits grocery stores from reducing a
covered worker's compensation "as a result of this Ordinance going into effect," and
establishes a burden-shifting procedure for assessing whether a covered employer has
done so.  *Id.* at §5.91.060.

Since the City passed the Ordinance, Oakland, San Jose, Montebello, and
Seattle, Washington have all passed similar laws, and others are considering them.[4]

CGA responded to the Ordinance's passage by filing the instant Complaint.
Krogers, one of its major members, responded issuing a press release announcing that
it would close two Long Beach stores.  Docs. 2, 9.[5]  CGA has filed identical lawsuits

---

[4] Oakland Mun. Code Ch. 5.96; San Jose, Cal., Grocery Store Employee Hazard Pay
Premium Ordinance (Feb. 9, 2021); Montebello Mun. Code Ch. 5.10; Seattle, Wash.,
Grocery Employee Hazard Pay Ordinance (Feb. 3, 2021).

[5] Suhanna Hussein, "Ralphs and Food 4 Less set to close in Long Beach. They blame
hazard pay ordinance," LA Times (Feb. 1, 2021), available at:
https://www.latimes.com/business/story/2021-02-01/kroger-closes-two-long-beach-
grocery-stores-hazard-pay-ordinance.

against hazard-pay ordinances adopted in Oakland and Montebello.[6]

## ARGUMENT

### I.      The Ordinance is not preempted by the NLRA.

Whether a state or local law is preempted is a question of law that is properly resolved on a motion to dismiss.  *See, e.g.*, *Fortuna Enter. L.P. v. City of Los Angeles*, 673 F.Supp.2d 1000, 1003-04 (C.D. Cal. 2008) ("Since this is a facial challenge to the Ordinance, there is no need for further development of the facts."); *see also Indus. Truck Ass'n, Inc. v. Henry*, 125 F.3d 1305, 1309 (9th Cir. 1997).[7]

CGA's Complaint and injunction briefs proceed from misunderstandings about federal labor law's relationship to state employment standards.

### A.      *Machinists* preemption applies to state laws that regulate the bargaining process, not substantive employment protections.

CGA's argues that the Ordinance is preempted under the *Machinists* doctrine of federal labor preemption.  Doc. 9, ¶ 24 (citing *Lodge 76, Int'l Ass'n of Machinists v. Wisc. Emp't Relations Comm'n*, 457 U.S. 132 (1976)).

Under the *Machinists* doctrine, "[s]tates are . . . prohibited from imposing additional restrictions on economic weapons of self-help, such as strikes and lockouts, unless such restrictions presumably were contemplated by Congress." *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614–615 (1986).  State activity is preempted under this doctrine "on the theory that preemption is necessary to further Congress['s] intent that 'the conduct involved be unregulated because [it should be] controlled by the free play of economic forces.'" *Fort Halifax*, 482 U.S. at 19–20 (quoting *Machinists,* 427 U.S. at 140) (second edit in original).  Thus, *Machinists*

---

[6] *California Grocers Association v. City of Oakland*, Case No. 21-cv-00863-DMR (N.D. Cal.); *California Grocers Association v. City of Montebello*, Case No. 21-cv-01011-FLA-AGR (C.D. Cal.).

[7] CGA asserts a facial challenge, rather than an as-applied one, because it seeks an injunction to prevent the Ordinance's enforcement under any circumstances.  *See Am. Hot. & Lodg. Ass'n v. City of L.A.*, 119 F.Supp.3d 1177, 1194 (C.D. Cal. 2015).

preemption—like the NLRA itself—is "concerned primarily with establishing an equitable *process* for determining terms and conditions of employment, and not with particular substantive terms of the bargain[.]" *Metro. Life Ins. Co. v. Mass*, 471 U.S. 724, 753 (1985) (emphasis added); *Burnside v. Kiewit Pac. Corp.*, 491 F.3d 1053, 1068–69 (9th Cir. 2007); *cf. Machinists*, 427 U.S. at 135-36 (state law punishing peaceful union strike as unfair labor practice preempted); *Teamsters v. Morton,* 377 U.S. 252, 260 (1964) (state law prohibiting unions from using the "economic weapon" of secondary boycotts during labor disputes preempted).

State and local laws that establish substantive employment standards are not preempted under *Machinists* because they do not interfere with the collective bargaining process.  The Supreme Court has made this point repeatedly.  In *Metropolitan Life Insurance Company v. Massachusetts*, Massachusetts required health insurance plans, including collectively bargained plans, to have certain mental health benefits.  *Metro. Life*, 471 U.S. at 748.  The employer argued that this interfered with its right to bargain for a lower level of health insurance benefits than those mandated by state law.  *Id.* at 751.  The Court rejected this argument:

> Minimum state labor standards affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA. . . .  Rather, they are minimum standards "independent of the collective-bargaining process [that] devolve on [employees] as individual workers, not as members of a collective organization."

*Id.* at 755 (internal quotation and citation omitted).  Congress legislated against a backdrop of state employment protections, yet "there is no suggestion in the legislative history of the Act that Congress intended to disturb the myriad state laws then in existence that set minimum labor standards, but were unrelated in any way to the processes of bargaining or self-organization."  *Id*. at 756.

In *Fort Halifax Packing Company v. Coyne*, the Court held that a Maine law requiring companies to pay their workers severance when they closed large plants was

6

not preempted.  Like CGA, the employer argued "that the Maine law intrudes on the bargaining activities of the parties because the prospect of a statutory obligation undercuts the employer's ability to withstand a union's demand for severance pay." *Fort Halifax*, 482 U.S. at 20.  The Court disagreed: "This argument—that a State's establishment of minimum labor standards undercuts collective bargaining—was considered in and rejected in *Metropolitan Life Ins. Co. v. Massachusetts*[.]" *Id.* The Court continued:

> It is true that the Maine statute gives employees something for which they otherwise might have to bargain.  That is true, however, with regard to any state law that substantively regulates employment conditions.  Both employers and employees come to the bargaining table with rights under state law that form a "backdrop" for their negotiations.

*Id.* at 21.  The fact "that a state statute pertains to matters over which the parties are free to bargain cannot support a claim of pre-emption[.]"  *Ibid.*

Both unions and employers negotiate from state-law baselines.  "Absent a collective-bargaining agreement, for instance, state common law generally permits an employer to run the workplace as it wishes.  The employer enjoys this authority without having to bargain for it."  *Ibid.*  If an employer and a union do not agree on a just-cause provision, then the at-will employment rule applies to the union's members. *See* Cal. Labor Code §2922.  California's at-will employment rule is not preempted because it gives employers something that they would otherwise have to bargain for, any more than state and local wage mandates are.  *Am. Hotel & Lodging Ass'n*, 834 F.3d at 963 ("[S]tate action that intrudes on the mechanics of collective bargaining is preempted, but state action that sets the stage for such bargaining is not.").

CGA misrepresents (or more likely, misunderstands) a passage from *Machinists* in arguing otherwise.  In its preliminary-injunction briefing, CGA argues that the *Machinists* Court "held that state and local laws are therefore preempted where they 'attempt to influence the substantive terms of collective bargaining agreements.'"  Doc. 26, at 3 (quoting *Machinists*, 427 U.S. at 153).  But the quote in question reads in its

entirety: "'[I]f the [National Labor Relations Board] could *regulate the choice of economic weapons* that may be used as part of collective bargaining, it would be in a position to exercise considerable influence upon the substantive terms on which the parties contract.'" *Machinists*, 427 U.S. at 153 (emphasis added). The Court was quoting *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 490 (1960), which held that the NLRB could not "in the guise of determining good or bad faith in negotiations . . . regulate what *economic weapons* a party might summon to its aid." Neither case says anything about state or local employment standards; both deal with *economic weapons* that Congress intended to remain unregulated. CGA's blunder underscores how far out of its depths it is in arguing its labor-preemption theory.

Courts in this Circuit have repeatedly applied *Metropolitan Life* and *Fort Halifax* to uphold substantive labor standards over *Machinists* challenges, stressing in each case the fundamental difference between state substantive employment protections and state laws that regulate the collective-bargaining process. *See, e.g.*, *Am. Hotel & Lodg. Ass'n*, 834 F.3d at 963–65 (city ordinance requiring higher minimum wages and compensated time off for employees of large hotels not preempted); *Nunn,* 356 F.3d at 990 (minimum wages and benefits for state-registered apprentices on public and private construction projects not preempted); *Viceroy Gold Corp. v Aubry*, 75 F.3d 482, 489–90 (9th Cir. 1996) (overtime regulation that applied only to miners not preempted); *Nat. Broad. Co. v. Bradshaw*, 70 F.3d 69, 71–73 (9th Cir. 1995) (state overtime protection for the broadcast industry not preempted); *Kyne v. Ritz-Carlton Hotel Co*., 835 F.Supp.2d 914, 929 (D. Haw. 2011) (hotel service-charge ordinance not preempted); *Wadsworth v. KSL Grand Wailea Resort, Inc.*, 818 F. Supp. 2d 1240, 1261 (D. Haw. 2010) (same); *Fortuna Enter. L.P. v. City of Los Angeles*, 673 F.Supp.2d 1000, 1006–12 (C.D. Cal. 2008) (living-wage ordinance that applied to hotels in area adjacent to airport not preempted); *Columbia Sussex Mgmt., LLC v. City of Santa Monica*, No. 219CV09991ODWSKX, 2020 WL 5358505, at *7 (C.D. Cal. Aug. 28, 2020) ("The Workload Limitation Provision and its corresponding Waiver

1  'do not regulate the mechanics of labor dispute resolution,' but instead 'provide the

2  "backdrop" for negotiations,' similar to other state minimum labor standards.").

3      CGA nibbles around the edges of these cases, attempting to distinguish some

4  based on factual differences in the wages mandated or the industries and employers

5  covered.  *See* Doc. 26, at 5-7.  But it fails to recognize that Ninth Circuit courts upheld

6  all of these targeted employment standards based on the basic difference between

7  substantive employment standards and regulation of the collective bargaining process.

8  CGA's rote repetition of arguments that the Supreme Court and Ninth Circuit courts

9  have consistently rejected borders on frivolous.

10  ### B.    The Ordinance establishes a substantive labor standard and does not regulate the collective-bargaining process.

12      The Ordinance mandates that grocery employers pay their non-supervisory

13  workers an hourly premium to compensate for the job-related hazards posed by

14  COVID-19 and to promote their retention during the pandemic.  Ordinance,

15  §§5.91.005, 5.91.050(A).  To ensure that the Ordinance is not rendered a nullity, the

16  Ordinance prohibits employers from reducing workers' hours or their other

17  compensation "as a result of [the] Ordinance going into effect."  *id.* at §5.91.060.

18      CGA does not allege that the Ordinance directly regulates the process of

19  collective bargaining.  Instead, it argues that the Ordinance interferes with collective

20  bargaining by "empower[ing] the UFCW or other collective bargaining units [*sic*] to

21  secure a wage rate they could not otherwise have obtained from the employer at a

22  unionized or non-union grocery store."  Doc. 9, ¶26; *see also* Doc. 26, at 5 (arguing

23  that the Ordinance "'virtually dictates the results of the contract' between stores and

24  UFCW 324, which is the process of negotiating premium pay for hours worked during

25  the pandemic.").  This is the same argument made by the employer and rejected by the

26  Supreme Court in *Fort Halifax*.  *See* 482 U.S. at 20 (rejecting employer's argument

27  that Maine law was preempted because it "undercut[] an employer's ability to

28  withstand a union's demand for severance pay").  A unionized employer is not

prohibited from negotiating additional pay for its employees, including additional hazard pay.  *Cf.* Doc. 26, at 6.  But both union and non-union employers are required to provide the mandated hazard pay regardless of the outcome of those negotiations.

CGA also claims that the Ordinance "is not a minimum labor standard[]" but rather a "mandatory hourly bonus for a specific group of workers[.]"  Doc. 2. ¶27.  This is a *non-sequitur*.  If CGA's argument is that only minimum-wage laws are exempt from *Machinists* preemption and not laws that mandate bonuses or premium-pay, the argument is baseless.  *See, e.g.*, *Ft. Halifax*, 482 U.S. at 20-22 (upholding statute requiring week's pay for each year of employment as severance); *Bradshaw*, 70 F.3d at 72 (law requiring double-rate overtime in broadcast industry).

Similarly, the fact that the Ordinance applies to employees of large grocery companies is irrelevant.  *See, e.g.*, *Am. Hotel & Lodg. Ass'n*, 834 F.3d at 963–65 (minimum-wage law that applied to non-supervisory workers at large hotels in Los Angeles not preempted); *Viceroy Gold Corp.*, 75 F.3d 489-90; *Bradshaw*, 70 F.3d at 72; *Fortuna Enter.*, 673 F.Supp.2d at 1006–12 (minimum-wage ordinance that applied to large hotels in the district surrounding Los Angeles International Airport not preempted).  CGA complains that the Ordinance is "extremely narrowly tailored" and applies only to a limited number of grocery stores.  Doc. 26, at 5.  But the fact that the City targeted large businesses in one industry does not support preemption: "It is now clear in this circuit that state substantive labor standards, including minimum wages, are not invalid simply because they apply to particular trades, professions, or job classifications rather than to the entire labor market."  *Nunn*, 356 F.3d at 990;[8] *Cal. Grocers Ass'n v. City of Los Angeles*, 52 Cal.4th 177, 193-208 (2011) (ordinance protecting large grocery stores' non-supervisory employees not preempted).

---

[8] CGA's reliance on *520 S. Michigan Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1136 (7th Cir. 2008) for the "common sense proposition" that more "stringent" or targeted substantive employment standards are more likely to be preempted ignores the fact that the Seventh Circuit panel only arrived at its conclusion by refusing to follow post-*Bragdon* Ninth Circuit precedent.  *Id*. at 1131.

CGA further claims that the City did not adopt the Ordinance for an acceptable reason, and that "[w[hile the City has the ability to enact ordinances to further the health and safety of its citizens, the Ordinance here bears no relation to those goals." Doc. 9, ¶27. But the City's police power is not limited to health- and safety-related legislation. "'States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State. Child labor laws, minimum and other wage laws, laws affecting occupational health and safety . . . are only a few examples.'" *Metropolitan Life*, 471 U.S. at 756 (quoting *Canas v. Bica*, 424 U. S. 351, 356 (1976)). Mandating premium or supplemental pay for particularly difficult work is commonplace. *See, e.g.*. Cal. Labor Code §§858, 860 (finding that "[a]gricultural employees engage in back-breaking work every day" and mandating overtime premium pay for them); *California Hotels & Lodging Ass'n v. City of Oakland*, 393 F. Supp. 3d 817, 821-22 (N.D. Cal. 2019) (rejecting state and federal preemption challenges to ordinance requiring premium pay for assignment of heavy workloads to hotel housekeepers); *Columbia Sussex Mgmt*, 2020 WL 5358505, at *7 (upholding similar law over *Machinists* preemption challenge).

CGA's belief that "[l]ocal minimum wage laws . . . seek to lessen the burden on public welfare services"—and that this is what saves them from preemption—is bizarre. *See* Doc. 9, ¶27. While some jurisdictions may hope that increasing local minimum wages will decrease demand for means-tested municipal services, the main goal of living-wage ordinances is to address poverty in high-cost cities. *See RUI One Corp.*, 371 F.3d at 1141 ("Recognizing the plight of its own working poor, the City of Berkeley, California, has joined dozens of other cities nationwide to help bridge the gap between federal and state laws setting the minimum wage—the real value of which has decreased over the past few decades—and the costs of modern urban living by enacting 'living wage' ordinances."). Mandating additional pay to compensate grocery workers for the risks that they face is "a valid and unexceptional exercise of the [City's] police power." *Metropolitan Life*, 471 U.S. at 758.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
Case No. 21-cv-00524-ODW-AS

CGA also argues that the Ordinance is preempted because it is "designed" to benefit UFCW Local 324.  Doc. 9, ¶¶16-17, 27; Doc. 26, at 3.  To the extent that CGA is arguing that the Ordinance is preempted because it is the result of unions lobbying for legislation benefiting their members, that argument is baseless.  "Congress did not intend for the NLRA's . . . preemptive scope to turn on state officials' subjective reasons for adopting a regulation or agreement."  *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1026 (9th Cir. 2010) (refusing to consider plaintiffs' argument that the community college district had "ulterior motives" to "reward the unions"); *Int'l Paper Co. v. Town of Jay*, 928 F.2d 480, 483–84 (1st Cir. 1991) (declining to read preemption doctrine "so broadly as to require inquiry . . . into the motives of the selectmen prior to the Board's drafting and proposing the Ordinance"); *N. Ill. Chapter of Assoc. Builders and Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1007 (7th Cir. 2005) ("Federal preemption doctrine evaluates what legislation *does*, not why legislators voted for it or what political coalition led to its enactment."); *Prime Healthcare Servs., Inc. v. Harris*, 216 F. Supp. 3d 1096, 1121 (S.D. Cal. 2016) ("In determining whether NLRA preemption applies, a court does not conduct a subjective inquiry into the reasons for the action.").

CGA finds it suspect that the Ordinance excludes "confidential employees" from the definition of a "grocery worker" and sees a plot to cover only "union-eligible" employees.  Doc. 26, at 3 & n.1.  But exclusions for confidential employees are common, including in California employment laws.  *See, e.g.*, Cal. Lab. Code § 1060 (Displaced Janitor Opportunity Act) ("'Employee' does not include a person who is a managerial, supervisory, or confidential employee, including those employees who would be so defined under the federal Fair Labor Standards Act"); Cal. Lab. Code § 2502 (Grocery Worker Retention Act) ("'Eligible grocery worker' does not include a managerial, supervisory, or confidential employee."); L.A. Admin. Code § 10.37.1(f). Excluding confidential employees from legal protection is not, as CGA argues, limited to the NLRA.  *Cf.* Doc. 26, at 3.  "Confidential employees" are exempt from federal

civil service protections, for example. *See* 5 U.S.C. § 7511(b)(2); *Stanley v. Gonzales*, 476 F.3d 653, 656 (9th Cir. 2007). They are also excluded from First Amendment protection against retaliation. *Biggs v. Best, Best & Krieger,* 189 F.3d 989, 993 (9th Cir. 1999). The City could rationally conclude that employees entrusted with their employer's confidential information would have power to negotiate COVID-related compensation, and that covering such employees is incompatible with the Ordinance's anti-retaliation provision, just as it is considered to be for other forms of retaliation protection. *See Am. Hotel & Lodging Ass'n*, 119 F. Supp. 3d at 1195 (upholding minimum-wage ordinance that excluded "confidential" hotel employees).

Finally, CGA argues that the Ordinance is preempted because it does not contain a so-called "opt-out" provision, allowing unions and unionized employers to waive the generally applicable standard and bargain for something else. Doc. 26, at 6, 7. Some employers have argued unsuccessfully that cities' *inclusion* of a collective-bargaining opt-out supported a *Machinists*-preemption claim. *See Am. Hotel & Lodging Ass'n*, 834 F.3d at 965 ("The Supreme Court has made clear, however, that the NLRA 'cast[s] no shadow on the validity of these familiar and narrowly drawn opt-out provisions.'") (quoting *Livadas v. Bradshaw,* 512 U.S. 107, 132 (1994)); *Nat'l Broad. Co. v. Bradshaw,* 70 F.3d at 72 (upholding application of opt-out provision to broadcast-industry overtime law). But no support exists for the notion that employment laws are *required* to include collective-bargaining opt-outs that exempt unionized workers from the protection of otherwise applicable employment standards. Such a rule would improperly penalize union workers. *See Burnside*, 491 F.3d at 1070 ("To hold otherwise would impermissibly disadvantage the unionized employee, because a failure to negotiate the right nevertheless will result in its forfeiture.").

### C.   *Chamber of Commerce v. Bragdon* does not apply to the Ordinance.

CGA relies exclusively on *Chamber of Commerce v. Bragdon*, 67 F.3d 497 (9th Cir. 1995). Doc. 18, at 6. But *Bragdon* is factually distinct and more recent Ninth Circuit precedent abrogates the case's broader *dicta*.

*Bragdon* involved an ordinance that required contractors on private construction projects to provide a wage-and-benefit package that was determined exclusively by reference to collective-bargaining agreements. *Bragdon*, 67 F.3d at 502.  As the Ninth Circuit later explained in clarifying the case's scope, the problem with the prevailing-wage ordinance in *Bragdon* was that it required private, non-union employers to comply with the *collectively bargained* wages and benefits in the unionized sector. *Nunn*, 356 F.3d at 991.  "This manner of setting wages, the court held, gave employers what amounted to a Hobson's choice—they had either to accept the results of third parties' collective bargaining processes or enter into a collective bargaining agreement themselves." *Calop Bus. Sys., Inc. v. City of Los Angeles*, 984 F. Supp. 2d 981, 1011 (C.D. Cal. 2013), *aff'd in part, appeal dismissed in part*, 614 F. App'x 867 (9th Cir. 2015).  For that reason, "[i]n invalidating Contra Costa County's *prevailing* wage ordinance, we carefully distinguished, for purposes of preemption, state-established *minimum* wage regulations, which we acknowledged to be lawful." *Nunn*. 356 F.3d at 991 n.8 (citing *Bragdon*, 64 F.3d at 502).  *See also Am. Hotel & Lodging Ass'n*, 834 F.3d at 965 n.5 (ordinance in *Bragdon* was preempted because "prevailing wages were defined as the per diem wages set by the state for public works projects, which in turn were based on the wages in local collective bargaining agreements, effectively forcing nonunion employers to pay what amounted to a union wage.").

All workplace statutes impose wages and other terms of employment without requiring affected employers and employees to bargain for them.  This is not a basis for holding them preempted.  *See, e.g.*, *Metro. Life¸* 471 U.S. at 748; *Fort Halifax*, 482 U.S. at 21; *cf.* Doc. 18, at 6.  *Bragdon* held that the prevailing wage ordinance before it was preempted because the ordinance made non-union contractors' wages and benefits dependent on third-parties' collectively bargaining, and thus "affect[ed] the bargaining process in a much more invasive and detailed fashion," than wage-and-hour laws. *Bragdon*, 67 F.3d at 502; *Nunn*, 356 F.3d at 991.  The Ordinance does not do this.

As CGA should recognize, the Ninth Circuit has effectively limited *Bragdon* to its facts and rejected requests to strike down minimum- and premium-pay requirements like the Ordinance's based on the decision's broader *dicta*.  *See Cal. Grocers Ass'n*, 52 Cal.4th at 200 ("[T]he Ninth Circuit Court of Appeals has effectively repudiated *Bragdon*, and a majority of other circuits have limited *Bragdon* to its facts."); *American Hotel & Lodging Ass'n*, 834 F.3d at 965 n.5 (distinguishing minimum-wage requirement before it from prevailing-wage ordinance in *Bragdon*); *Assoc. Builders & Contractors of Cal. Cooperation Comm., Inc. v. Becerra*, 231 F. Supp. 3d 810, 823–24 (S.D. Cal. 2017), *aff'd sub nom. Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879 (9th Cir. 2018) ("Plaintiffs ignore that the Ninth Circuit has retreated from its holding in *Bragdon*, cautioning that it 'must be interpreted in the context of Supreme Court authority and . . . other, more recent, rulings on NLRA preemption.'") (quoting *Nunn*, 356 F.3d at 990); *Fortuna Enters.*, 673 F.Supp.2d at 1010 (noting the Ninth Circuit's "significant retreat from its holding in *Bragdon*" and upholding minimum-wage law that applied to workers at large hotels in airport district); *see also Rondout Elec., Inc. v. NYS Dep't of Labor*, 335 F.3d 162, 169 (2d Cir. 2003) (questioning whether *Bragdon* was decided correctly and distinguishing it); *St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin Islands*, 218 F.3d 232, 244 (3d Cir. 2000) (questioning compatibility of *Bragdon* with *Metropolitan Life* and *Fort Halifax* and declining to follow it); *cf. 520 South Michigan Ave. Assoc.*, 549 F.3d at 1134.

If anything, CGA misuses *Bragdon* to an even greater degree, citing the Ordinance's very *neutrality* toward collective bargaining as a reason that it is preempted.  Doc. 9, ¶27 (citing Ordinance's requirement of premium-pay "regardless of the wage negotiated in collective bargaining agreements" as a reason it is preempted); Doc. 18, at 7 (complaining about "disparate impacts on union and non-union workers[]" because the Ordinance does not take higher, collectively bargained pay rates into account).  CGA's illogical argument is apparently that the Ordinance is so neutral toward collective bargaining that it interferes with it.

15

Like other employers before it, CGA argues—based on *Bragdon* and misleading quotations from *American Hotel & Lodging Association*—that the Ordinance should be held preempted because it is "too stringent" or onerous to covered grocery stores.  Doc. 26, at 5 (arguing that Ordinance's premium pay is preempted because it represents a "27% raise on the low range of the compensation spectrum.").  *American Hotel & Lodging Association* did not endorse this view.  It made clear that the decision in *Bragdon* was based on the fact that the ordinance tied mandated wages and benefits to collectively bargained rates.  834 F.3d at 965 & n.5.  Covered hotels attacked the ordinance for mandating a substantial increase in minimum wages and "disregard[ing] the hotel industry's distinction between tipped and non-tipped employees, which creates exceedingly costly compensation schemes inconsistent with hotel economies[.]"  *Am. Hotel & Lodging Ass'n*, 119 F. Supp. 3d at 1186.  But the trial court pointed out that "Plaintiffs cannot identify a single case where any court held that a minimum labor standard was so onerous that it rendered the statute preempted," *id*. at 1191, and it ventured that "a minimum wage standard would need to have a degree of outrageousness — an amount that is completely arbitrary and has no rational basis with respect to its intended purpose — for it to be considered an extreme case that compels preemption."  *Id*. at 1192.  Even if the argument that a minimum-wage law may be held *Machinists* preempted based on its "stringent" nature—which the Ninth Circuit's decisions *Nunn* and *American Hotel & Lodging Association* (as well as *Metropolitan Life* and *Fort Halifax*) foreclose—a $4.00 increase in hourly pay for employees of large grocery stores would not establish preemption.

The Court should dismiss CGA's federal labor preemption cause of action.

## II.   The Ordinance does not violate the Contracts Clauses of either the United States or California Constitutions.

CGA includes causes of action claiming that the Ordinance violates the U.S. and California Contracts Clauses.  Doc. 9, ¶¶41-47.  But CGA's preliminary-injunction motion foregoes any attempt to argue this claim.  *See* Doc. 26, at 8-16.  The contract-

clause causes of action appear to simply be a stalking horse for CGA's claim that the Ordinance violates equal protection.  Doc. 26, at 9-10; *see infra*.  They have no merit.

"Although the text of the Contract Clause is facially absolute, the Supreme Court has long held that its prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people."  *RUI One Corp.*, 371 F.3d at 1146 (internal citations and quotation marks omitted).  "The Contract Clause does not deprive the States of their 'broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result.'"  *Exxon Corp. v. Eagerton,* 462 U.S. 176, 190 (1983); (quoting *United States Trust Co. v. New Jersey,* 431 U.S. 1, 22 (1977)).

Whether a regulation violates the Contract Clause is governed by a three-step inquiry: "The threshold inquiry is 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.' " *Energy Reserves*, 459 U.S. at 411 (quoting *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244 (1978)).  If this threshold inquiry is met, the court must inquire whether "the State, in justification, [has] a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem." *Energy Reserves*, 459 U.S. at 411–12 (citation omitted).  Finally, the court must inquire "whether the adjustment of 'the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.' " *Id.* at 412–13 (quoting *United States Trust Co. v. New Jersey,* 431 U.S. 1, 22 (1977)).

Courts apply a deferential standard to economic regulation affecting private contracts.  "Unless the State itself is a contracting party, 'as is customary in reviewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.' " *Energy Reserves*, 459 U.S. at 412–13 (quoting *U.S. Trust Co.,* 431 U.S. at 22–23); *RUI One Corp.*, 371 F.3d at 1150 (upholding a municipal living wage ordinance that altered contractual

expectations because "[t]he power to regulate wages and employment conditions lies clearly within a state's or a municipality's police power."); *Ass'n of Surrogates & Supreme Court Reporters Within City of N.Y. v. State of N.Y.*, 940 F.2d 766, 771 (2d Cir. 1991) ("[L]egislation which impairs the obligations of *private* contracts is tested under the contract clause by reference to a rational-basis test[.]"); *Chicago Bd. of Realtors, Inc. v. City of Chicago*, 819 F.2d 732, 737 (7th Cir. 1987) (where government is not a party, courts assess whether the government adopted a law that it "rationally could have believed would lead to improved public health and welfare").

### A. The Ordinance does not substantially impair the terms of any employment contract or collective bargaining agreement.

CGA's theory of how the Ordinance impairs its members' contracts is a mystery. All that CGA says is that "[t]he Ordinance substantially interferes with Members' contracts, including its collective bargaining agreements." Doc. 9, ¶43. This is a legal conclusion, not a factual assertion, and is insufficient to avoid dismissal. *See Iqbal v. Ashcroft*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). CGA never even identifies which contract terms were allegedly impaired. Nor has CGA elaborated on its contracts-clause theory in its preliminary-injunction briefing. *See* Doc. 18, at 10 n.1; Doc. 26, at 8-16.

In any event, a state or local mandate that an employer pay minimum wages or a wage premium does not substantially impair the employer's employment contract or collective bargaining agreement. No employment contract contains a legally enforceable term that immunizes the employer from statutes and ordinances that protect the contracting employee.

> Otherwise, one would be able to obtain immunity from the state regulation by making private contractual arrangements. . . . [As] summarized in Mr. Justice Holmes' well-known dictum: "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them."

18

*United States Trust,* 431 U.S. at 23; *see RUI One Corp.*, 371 F.3d at 1149. Like its equal-protection argument, *see infra*, CGA's contracts-clause claim calls for a return to the *Lochner* era, when constitutional "freedom to contract" superseded state regulation.

The analysis is no different for collective bargaining agreements. As explained above, federal labor law does not preempt the application of state employment standards to unionized workers, and does not permit states to withhold employment protections based on the fact that workers are unionized. "In the *Machinists* line of cases, the Court has repeatedly repudiated the idea that the mere ability of unionized workers to bargain collectively somehow makes it permissible to give unionized employees fewer minimum labor-standards protections under state law than other employees." *Burnside*, 491 F.3d at 1068; *Metro. Life Ins.,* 471 U.S. at 755–56 ("It would turn the policy that animated the Wagner Act on its head to understand it to have penalized workers who have chosen to join a union by preventing them from benefiting from state labor regulations imposing minimal standards on nonunion employers"). CGA members' collective bargaining agreements that do not mandate hazard pay, or that mandate hazard pay of less than $4.00, are not "impaired" by the Ordinance, any more than grocery stores' individual employment contracts are. Unless the statute in question includes an express "opt-out" provision, unionized employers may not contract around state employment protections any more than non-union ones may. *See Burnside*, 491 F.3d at 1069-70.

Even if CGA could allege how the Ordinance impairs its members' collective bargaining agreements (or other employment contracts), any such impairment would not be "substantial." *Energy Reserves*, 459 U.S. at 411 ("In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past."). Courts regularly reject contracts-clause challenges to economic regulation of the employment relationship, which is almost singularly subject to state regulation. *See RUI One*, 371 F.3d at 1150 ("The power to regulate wages and employment conditions lies clearly within a state's or a

municipality's police power."); *Olson v. California*, No. CV1910956DMGRAOX, 2020 WL 6439166, at *11 (C.D. Cal. Sept. 18, 2020) (rejecting contracts-clause challenge to AB5's classification of rideshare drivers; "a court is less likely to find substantial impairment when a state law 'was foreseeable as the type of law that would alter contract obligations.'") (quoting *Energy Reserves Grp.*, 459 U.S. at 416).

California employers are subject to extensive wage regulation at both the local and state levels. *See e.g.*, Cal. Labor Code §1182.12; Los Angeles Mun. Code §187.00 *et seq*. Wage regulations frequently target particular industries, and major employers within those industries. *See, e.g.*, Long Beach Mun. Code. §5.48.020 (higher minimum wage for large hotel employers). Cities and the State have singled out large grocery employers for special employment regulations. Los Angeles Mun. Code §181.00 *et seq.*; Cal. Lab. Code §2502. In light of this already extensive regulation of CGA members' wage terms and employment relationships, an additional $4.00 per hour wage mandate cannot be considered a "substantial" impairment.

**B. Even if it substantially impaired CGA members' contracts, the Ordinance has a reasonable public purpose.**

Government regulation of purely private contracts is subject to the same deferential review applied to other forms of economic and social legislation. *See Energy Reserves*, 459 U.S. at 412–13. As under equal-protection analysis, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id.*; *Olson*, 2020 WL 6439166, at *11 ("AB 5 fits within the State's authority to regulate employment relationships and thus satisfies the public purpose test imposed in a Contracts Clause challenge.").[9]

---

[9] CGA has cited to only two contracts-clauses cases in support of its theory, neither of which is applicable. *Sonoma Ct. Org. of Pub. Employees v. City of Sonoma*, 23 Cal.3d 296 (1979) involved cities' attempts to abrogate wage-increases set forth in their own collective bargaining agreements with public-sector unions, not the economic regulation of private contracts. *Spannaus*, 438 U.S. at 250–51, involved a pension law that would have *retroactively* modified compensation that an employer had paid for the past decade. *See Olson v. California*, No. CV1910956DMGRAOX, 2020 WL 5572, at

20

The Ordinance's rational bases are described below.  CGA's argument that there is no reasonable or legitimate reason for the City to mandate hazard pay is in obvious conflict with the fact that CGS's own members considered such pay appropriate to compensate their workers for the COVID-related risks that those workers faced during the first wave of the pandemic.  *Cf.* Doc. 9, ¶3; *supra*, nn. 2, 3.

### III.   The Ordinance does not violate the U.S. or California Equal Protection Clause.

### A.   There is no fundamental "freedom to contract."

The absurdity of CGA's equal-protection argument is demonstrated by the fact that under it, a plaintiff who challenges the economic regulation of a private contract under the Contracts Clause itself must demonstrate that the regulation lacks *any reasonable basis*, while the same economic regulation is subject to *strict scrutiny* under the Equal Protection Clause when a plaintiff merely asserts that the regulation "implicates" the Contracts Clause.  Doc. 26, at 11-12 (positing theory under which "the Ordinance need not *violate* the Contracts Clause to trigger heightened scrutiny under the Equal Protection Clause.").  If CGA were correct, all federal and state legislation that mandated employment standards (and any other regulation that allegedly impaired a contract and thus "implicated" the Contracts Clause) would face strict scrutiny.

CGA is, in fact, positing a "nebulous" "fundamental right to be free from unreasonable governmental interference with [] contracts, specifically [] collective bargaining agreements and other employment agreements."  *Cf.* Doc. 9 ¶ 34; Doc. 26, at 11; *Lochner*, 198 U.S. at 53 (statute imposing work-hour limitation "interferes with the right of the contract between employer and employe[e]s[.]").  Courts have refused to recognize a fundamental liberty of contract for many years.  *West Coast Hotel Co.*, 300 U.S. at 391 ("The Constitution does not speak of freedom of contract."); *cf. Chicago Bd. of Realtors*, 819 F.2d at 745 ("The plaintiffs have brought their case in the

---

*12 (C.D. Cal. Feb. 10, 2020) ("Plaintiffs cite to inapposite cases that find substantial impairment of existing contracts based on statutes that applied *retroactively*.").

wrong era.") (Posner, J.).  Fourteenth Amendment theories based on freedom from contractual impairment "have been long superseded by [the Supreme Court's] approach to the Contract Clause developed over the past three decades, subjecting only state statutes that impair a specific (explicit or implicit) contractual provision to constitutional scrutiny," and striking down regulations affecting private contracts only if they lack a rational basis.  *RUI One Corp.*, 371 F.3d at 1151; *Energy Reserves*, 459 U.S. at 412–13.  CGA cannot reinvigorate a baseless contracts-clause claim through the backdoor of the Equal Protection Clause.

> **B.    The Ordinance is subject to rational-basis review.**

"In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313 (1993).

Courts in this Circuit subject regulation of the employment relationship to rational-basis review because such laws do not implicate fundamental constitutional rights.  *See, e.g.*, *Int'l Franch. Ass'n*, 803 F.3d at 407 (district court correctly applied rational-basis review to law requiring franchised employers to pay higher minimum wage); *RUI One Corp.*, 371 F.3d at 1154 (applying rational-basis review to law requiring employers in city marina district to pay living wage); *Fortuna Enters.*, 673 F. Supp. 2d at 1013 (applying rational basis to minimum-wage law that applied to large hotels in district surrounding LAX).  CGA says that it is "unable to find any case in which a court was called on to confront a law that directed a subset of employers in a particular industry to pay their employees a specified wage bump, in defiance of their existing contractual relationships," but this only proves that it has not understood the foregoing cases, or the many others upholding laws doing exactly that.  *See e.g.*, *Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1061 (9th Cir. 2018) (rejecting equal-protection challenge to requirement that ready-mix companies pay prevailing wages);

*Woodfin Suite Hotels LLC v. City of Emeryville*, No. 06-cv-1254-SBA, 2006 WL 2739309, at *21 (N.D. Cal. Aug 23, 2006) (rejecting equal-protection challenge to minimum-wage ordinance that applied to large hotels); *cf*. Doc. 26, at 15.

Every employer can say that a minimum-wage regulation stands "in defiance of [its] existing contractual relationships" to pay less.  Doc. 26, at 15.  This does not allow the employer's equal-protection challenge to avoid rational-basis review.

### C.    The Ordinance is a rational response to the COVID-19 pandemic.

The Ordinance easily meets rational-basis review.  The City Council decided that "[r]equiring grocery stores to provide premium pay to grocery workers compensates grocery workers for the risks of working during a pandemic."  Ordinance, §5.91.005.  The Council found that "[g]rocery store workers face magnified risks of catching or spreading the COVID-19 disease because the nature of their work involves close contact with the public, including members of the public who are not showing symptoms of COVID-19 but who can spread the disease."  *Ibid*.  The City's conclusion that grocery workers face a particular risk of contracting COVID-19 is clearly rational. It is borne out by at least one study by occupational epidemiologists and is Cal/OSHA's current risk assessment.  *See supra*, n.1.[10]  Requiring employers to pay additional compensation for work that is particularly risky or arduous is commonplace

---

[10] *See* California Dept. of Industrial Relations, "Cal/OSHA Issues Citations to Grocery Stores for COVID-19 Violations," Release No. 2020-83 (Sept. 30, 2020) ("Grocery retail workers are on the front lines and face a higher risk of exposure to COVID-19," said Cal/OSHA Chief Doug Parker. "Employers in this industry must investigate possible causes of employee illness and put in place the necessary measures to protect their staff."), available at: https://www.dir.ca.gov/DIRNews/2020/2020-83.html.  *See also* Centers for Disease Control and Prevention, "What Grocery and Food Retail Workers Need to Know about COVID-19" (Nov. 12, 2020) ("As a grocery or food retail worker, potential sources of exposures include close contact for prolonged periods of time with a customer with COVID-19 and touching your nose, mouth, or eyes after handling items, cash, or merchandise that customers with COVID-19 have touched."), available at: https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/grocery-food-retail-workers.html.

in California, *see supra*, Part I.B, and is the basis, for example, of the statutory overtime wage premium.  Cal. Labor Code §510.

The Ordinance also explains that the additional hazard pay will "better ensure the retention of these essential workers who are on the frontlines of this pandemic providing essential services and who are needed throughout the duration of the COVID-19 emergency." *Id.*  The link between higher wages and employee retention is both rational and well-established, and the City has a legitimate interest in reducing turnover in grocery stores patronized by the public, so that employees experienced in COVID-19 safety protocols remain on the job.[11]

Many of CGA's arguments are attempts at misdirection.  For example, it argues that "paying these workers an extra $4 an hour . . . will not protect anyone from coronavirus infection."  Doc. 26, at 15.  The Ordinance is not intended to protect grocery workers from COVID-19, but to *compensate* them for the risk of contracting it.

CGA disputes the City's policy judgments, arguing that mandating additional pay does not promote employee retention but "will do just the opposite—raising costs to the extent that at least some stores are forced to raise prices or shut down, threatening to leave many workers without employment entirely."  Doc. 26, at 15.  But even if CGA's view of labor economics were correct, "a state action need not *actually* further a legitimate interest; it is enough that the governing body '*could have rationally decided* that' the action would further that interest."  *Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d at 1031 (quoting *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466 (1981)); *Beach Commc'ns*, 508 U.S. at 313-14 ("Where there are plausible reasons for [legislative] action, our inquiry is at an end."); *cf. Guggenheim v. City of*

---

[11] *See* California Dept. of Industrial Relations, "COVID-19 Infection Prevention in Grocery Stores" (October 27, 2020) (detailing extensive training requirements and safety protocols for reducing the risk of COVID-19 transmission in grocery stores), available at: "https://www.dir.ca.gov/dosh/Coronavirus/COVID-19-Infection-Prevention-in-Grocery Stores.pdf?eType=EmailBlastContent&eID=77f0ecd5-92cc-447a-9968-e0a061eac2ef.

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
Case No. 21-cv-00524-ODW-AS

*Goleta*, 638 F.3d 1111, 1123 (9th Cir. 2010) ("Whether the City of Goleta's economic theory for rent control is sound or not, and whether rent control will serve the purposes stated in the ordinance of protecting tenants from housing shortages and abusively high rents or will undermine those purposes, is not for us to decide. We are a court, not a tenure committee[.]").

CGA complains that the Ordinance violates Equal Protection because other "similarly situated large retailers and other essential employees" are not also subject to it. Doc. 25, at 2. But legislative line-drawing of this kind is "'virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally.'" *RUI One Corp.*, 371 F.3d at 1155 (quoting *Beach Commc'ns*, 508 U.S. at 316). The City was not required to address every category of essential worker or none at all: "'[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others.'" *Beach Commn'ns*, 508 U.S. at 326 (quoting *Williamson v. Lee Optical of Ok., Inc.*, 348 U.S. 483, 489 (1955)). The City's focus on large grocery employers was rational, as these employers are more likely to be able to afford the mandated wage premium.

Finally, CGA argues that the Ordinance's "stated objectives are merely an attempt to impose a public policy rationale on interest-group driven legislation for labor unions and, in particular, for UFCW [Local] 324." Doc. 9, ¶ 35. But, even if this were true, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Beach Commc'ns*, 508 U.S. at 315; *RUI One Corp.*, 371 F.3d at 1155 (employer's argument that minimum-wage law's stated reasons "were not the real reasons" and that City "was instead motivated by a desire to help in the unionization campaign at a Marina hotel" irrelevant).

/ / /

/ / /

## CONCLUSION

CGA's constitutional claims are all barred by decades of established law.  The Court should dismiss the Complaint for failure to state a claim.

Dated: February 17, 2021                    Respectfully Submitted,

                                            McCRACKEN, STEMERMAN &
                                            HOLSBERRY, LLP


                                            By: */s/Paul L. More*
                                                PAUL L. MORE
                                                LUKE DOWLING

                                            *Attorneys for Intervenor United Food &*
                                            *Commercial Workers Local 324*

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
Case No. 21-cv-00524-ODW-AS

## <u>CERTIFICATE OF SERVICE</u>

I am employed in the city and county of San Francisco, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is: 595 Market Street, Suite 800, San Francisco, California 94105.

On February 17th, 2021, I served a copy of the foregoing document

**INTERVENOR UNITED FOOD & COMMERCIAL WORKERS LOCAL 324's MOTION TO DISMISS**

**INTERVENOR UNITED FOOD & COMMERCIAL WORKERS LOCAL 324's MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**

on the interested party(s) in this action, as follows:

***By ECF System - Court's Notice of Electronic Filing:***

**William F Tarantino**
**Byung-Kwan Park**
**Robert Santos Sandoval**
Morrison and Foerster LLP
425 Market Street
San Francisco, CA 94105
415-268-7000
Fax: 415-268-7522
Email: wtarantino@mofo.com
Email: bpark@mofo.com
Email: RSandoval@mofo.com

**Tritia M Murata**
Morrison and Foerster LLP
707 Wilshire Boulevard Suite 6000
Los Angeles, CA 90017-3543
213-892-5200
Fax: 213-892-5454
Email: tmurata@mofo.com

*Attorneys for California Grocers Association*

**Christopher M Pisano**
Best Best and Krieger LLP
300 South Grand Avenue 25th Floor
Los Angeles, CA 90071
213-617-8100
Fax: 213-617-7480
Email: christopher.pisano@bbklaw.com

*Attorneys for City of Long Beach*

1

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 17th Day of February, 2021, at San Francisco, California.

_____
Katherine Maddux

CERTICIATE OF SERVICE
Case No. 21-cv-00524-ODW-AS