O

# United States District Court
# Central District of California

| | |
|---|---|
| CALIFORNIA GROCERS ASSOCIATION,<br><br>              Plaintiff,<br><br>     v.<br><br>CITY OF LONG BEACH,<br><br>              Defendant.<br><hr>UNITED FOOD & COMMERCIAL WORKERS LOCAL 324,<br><br>              Intervenor. | Case № 2:21-cv-00524-ODW (ASx)<br><br>**ORDER DENYING PRELIMINARY INJUNCTION [18]** |

## I.     INTRODUCTION

The COVID-19 pandemic has been awful.  In an effort to avoid illness, permanent health damage, and death, we have lived in a state of quarantine for an entire year and counting.  Meanwhile, certain workers deemed "essential" have continued to work in roles that do not practically permit quarantining from others.  For example, grocery workers have served an essential function by keeping stores open, stocked, and sanitized, despite the perils of working frequently within six feet of the general public.

This case concerns the Premium Pay for Grocery Workers Ordinance ("Ordinance"), recently enacted by Defendant City of Long Beach ("City"), which mandates that all grocery workers in the area must be paid four dollars ($4.00) more than their hourly wage, for a period of at least 120 days. (*See* Compl. Ex. A ("Ordinance"), ECF No. 2.) The Ordinance also prohibits employers from reducing compensation or limiting a worker's earning capacity, so employers cannot directly circumvent the Ordinance's effect by lowering the dials on wages or hours.

Plaintiff California Grocers Association ("CGA") brings this action against the City, arguing that the Ordinance is invalid under federal and constitutional law. (*See* Compl., ECF No. 2.) Presently before the Court is CGA's request for a preliminary injunction stopping the enforcement of the Ordinance. (*See* Ex Parte Appl. for Temp. Restraining Order ("Application" or "Appl."), ECF No. 18; Min. Order Denying Appl. ("Min. Order"), ECF No. 22 (denying ex parte application for a TRO but setting hearing to consider a preliminary injunction).) The preliminary injunction issue has been fully, if not excessively, briefed. (*See* Appl.; Opp'n to Appl. ("Opp'n"), ECF No. 20; Suppl. Opp'n to Mot. Prelim. Inj. ("Suppl. Opp'n"), ECF No. 24; Reply ISO Mot. Prelim. Inj. ("Reply"), ECF No. 26.) On February 23, 2021, the Court took the matter under submission after thorough oral arguments. (Minutes, ECF No. 40.) For the reasons that follow, CGA's motion for a preliminary injunction is **DENIED**. (ECF No. 18.)

## II.   BACKGROUND

The City enacted the Ordinance on January 19, 2021. (*See* Compl. ¶ 5.) The Ordinance "aims to protect and promote the public health, safety, and welfare during the new coronavirus 19 (COVID-19) emergency by requiring grocery stores to provide premium pay for grocery workers performing work in Long Beach." (Ordinance § 5.91.005.) It also acknowledges that "[g]rocery workers face magnified risks of catching or spreading the COVID-19 disease because the nature of their work involves close contact with the public, including members of the public who are not showing symptoms of COVID-19 but who can spread the disease." (*Id.*) Thus, the Ordinance

contemplates that "premium pay better ensures the retention of these essential workers who are on the frontlines of this pandemic," and that grocery workers "are deserving of fair and equitable compensation for their work." (*Id.*)

In pertinent part, the Ordinance provides:

- "Hiring entities shall provide each grocery worker with premium pay consisting of an additional Four Dollars ($4.00) per hour for each hour worked." (*Id.* § 5.91.050(A).)
- "Hiring entities shall provide the [$4.00 premium pay] for a minimum of one hundred twenty (120) days from the effective date of th[e] Ordinance." (*Id.* § 5.91.050(B); *see also id* § 5.91.050(C) ("Unless extended by City Council, this ordinance shall expire in one hundred twenty (120) days.").)
- "No hiring entity shall, as a result of this Ordinance going into effect . . . [1] Reduce a grocery worker's compensation; [or 2] Limit a grocery worker's earning capacity." (*Id.* § 5.91.060(A).)
- "'Grocery worker' means a worker employed directly by a hiring entity at a grocery store. Grocery worker does not include managers, supervisors[,] or confidential employees." (*Id.* § 5.91.020.)
- "'Grocery store' means a store that devotes seventy percent (70%) or more of its business to retailing a general range of food products, which may be fresh or packaged." (*Id.* § 5.91.020.)
- "'Hiring entity' means a grocery store that employs over three hundred (300) grocery workers nationally and employs more than fifteen (15) employees per grocery store in the City of Long Beach." (*Id.* § 5.91.020.)
- "The provisions of this Ordinance are declared to be separate and severable. If any clause, sentence, paragraph, subdivision, section, subsection, or portion . . . , or the application thereof . . . is held to be invalid, it shall not affect the validity of the remainder of this Ordinance, or the validity of its application to other persons or circumstances." (*Id.* § 5.91.150.)

The day after the Ordinance was enacted, CGA brought this action "on behalf of its members who are grocery store employers." (Compl. ¶ 12.) CGA's members "operate grocery stores in the City that employ members of a specific labor union, United Commercial Food Workers International, Local 324 ('UCFW 324'), and those employees are parties to collective bargaining agreements that govern the terms of their employment, including wage scales."[1] (Compl. ¶ 13.) Now, CGA seeks a preliminary injunction to enjoin enforcement of the Ordinance. (*See* Appl.; Reply.)

### III. LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also* Fed. R. Civ. P. 65 (governing the issuance of preliminary injunctions). "An injunction is an exercise of a court's equitable authority," which should not be invoked as a matter of course, but "only after taking into account all of the circumstances that bear on the need for prospective relief." *Salazar v. Buono*, 559 U.S. 700, 714 (2010).

To obtain a preliminary injunction, the moving party must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party's favor; and (4) that an injunction is in the public interest. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).

### IV. DISCUSSION

A preliminary injunction is not warranted because CGA fails to establish a likelihood of success on the merits. CGA asserts five causes of action, each for declaratory and injunctive relief against enforcement of the Ordinance, based on: (1) NLRA preemption, (2) the Equal Protection Clause of the U.S. Constitution, (3) the

---

[1] UCFW 324 sponsored the Ordinance's passing, and the parties have stipulated for UCFW 324 to intervene as a Defendant in this action, notwithstanding the present motion for preliminary injunction between CGA and the City. (*Id.* ¶ 16; *see* Order Granting Mot. to Intervene, ECF No. 36.)

Equal Protection Clause of the California Constitution, (4) the Contracts Clause of the U.S. Constitution, and (5) the Contracts Clause of the California Constitution, respectively. (*See* Compl.)

### A. NLRA Preemption (First Cause of Action)

First, the Court considers whether CGA has established a likelihood of success on its preemption claim, whereby it alleges the Ordinance is preempted by the National Labor Relations Act, 29 U.S.C. §§ 151–69 ("NLRA"). (*See* Compl. ¶¶ 22–30.)

"The NLRA—the federal architecture that governs relations between labor and management, for example, union organizing, collective bargaining, and conduct of labor disputes—has no express preemption provision." *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 834 F.3d 958, 963 (9th Cir. 2016) [hereinafter *AHLA*] (citing 29 U.S.C. §§ 151–69; *Chamber of Commerce v. Brown*, 554 U.S. 60, 65 (2008)). "Nonetheless, the Supreme Court has recognized two implicit preemption mandates: *Garmon* preemption and *Machinists* preemption." *Id.* (citing *Brown*, 554 U.S. at 65). In this case, CGA relies solely on a theory of *Machinists* preemption, which "prohibits states from restricting a 'weapon of self-help,' such as a strike or lock-out." *AHLA*, 834 F.3d at 963 (quoting *Lodge 76, Int'l Ass'n of Machinists v. Wis. Emp't Rels. Comm'n*, 427 U.S. 132, 146 (1976) [*Machinists*]). The policy underlying the *Machinists* preemption is that "Congress left these self-help tools unregulated to allow tactical bargaining decisions 'to be controlled by the free play of economic forces.'" *Id.* (quoting *Machinists*, 427 U.S. at 140).

Generally, "the NLRA is concerned with ensuring an equitable *bargaining process*, not with the substantive terms that may emerge from such bargaining." *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 20 (1987) (emphasis added) (citing *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 754 (1985)). "Thus, the mere fact that a state statute pertains to matters over which the parties are free to bargain cannot support a claim of pre-emption . . . ." *Id.* at 21 (citing *Malone v. White Motor Corp.*, 435 U.S. 497, 504–05 (1978)) (rejecting preemption argument for statute requiring a

severance payment for employees who lacked express severance contracts); *see also Metro. Life Ins.*, 471 U.S. at 754 (rejecting preemption argument for law requiring minimum mental health care benefits under insurance policies and employee healthcare plans); *AHLA*, 834 F.3d at 963–66 (rejecting preemption argument for ordinance setting higher minimum wage and paid leave requirements for hotel workers). Indeed, this "general principle that governments can pass minimum labor standards pursuant to their police power without running afoul" of the NLRA is well established. *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 119 F. Supp. 3d 1177, 1187 (C.D. Cal. 2015), *aff'd*, *AHLA*, 834 F.3d at 958.

However, "in extreme cases, substantive requirements *could* be so restrictive as to virtually dictate the results of the collective bargaining and self-organizing process," in which case the *Machinists* preemption may apply. *Id.* (emphasis added) (internal quotation marks and brackets omitted) (quoting *Chamber of Com. of U.S. v. Bragdon*, 64 F.3d 497, 501 (9th Cir. 1995)). "The question then becomes the extent of the substantive requirements that a state may impose on the bargaining process." *Bragdon*, 64 F.3d at 501–02 (finding ordinance preempted where it "affect[ed] the bargaining process in a much more invasive and detailed fashion than the isolated statutory provisions of general application approved in *Metropolitan Life* and *Fort Halifax*"). In other words, "state action that intrudes on the *mechanics* of collective bargaining is preempted, but state action that sets the stage for such bargaining is not." *AHLA*, 834 F.3d at 964–65 (holding minimum labor standards not preempted where they "alter[ed] the backdrop of negotiations, not the mechanics of collective bargaining").

Here, CGA argues that the Ordinance unlawfully alters the mechanics of collective bargaining, notwithstanding the fact that minimum labor standards are generally not preempted by the NLRA. As articulated by CGA:

> [T]he Ordinance requires a very specific increase ($4/hour) in the baseline hourly wage, while *outlawing any other modification that could reduce the employee's compensation or earning potential* in any way. . . . [T]his provision effectively ties the employers' hands, rendering it impossible for

>employers to bargain with whatever tools she has available. It also implies employers must accept whatever business consequences may flow from an immediate 20–30% increase in labor costs, as reductions in hours, shifts, or workforce are illegal.

(Appl. 7; *see also* Compl. ¶ 15.)

In opposition, the City maintains that "[t]he Ordinance is [merely] a substantive labor standard benefiting union and non-union grocery workers as individuals." (Suppl. Opp'n 23 (emphasis removed).) The City also points out that the Ordinance "does not prevent an employer from taking *any* action (e.g., termination, reduction in hours) *as long as it is not a response to the Ordinance*." (*Id.* at 12 (second emphasis added).)

Problematically, though, the City's briefs simply do not address the prohibition's scope regarding actions that *are* taken as a result of the Ordinance. (Suppl. Opp'n 23–28 (assuming without discussion that the Ordinance "does not conflict in any way with the NLRA").) This poses somewhat of a barrier to resolution, as the issue of preemption ultimately turns on what it means to "[r]educe a grocery worker's compensation" or "[l]imit a grocery worker's earning capacity," as prohibited by the Ordinance. (*See* Ordinance § 5.91.060(A).) If the Ordinance really does prohibit *any* collective bargaining by grocers to mitigate increased labor costs that result from the Ordinance, then CGA's position is fairly compelling. For although numerous substantive labor standards have been found not preempted by the NLRA, those cases would all be distinguishable from the present action.

In cases like *Metropolitan Life*, *Fort Halifax*, and *AHLA*, the laws in question were upheld largely *because* they merely provided a "backdrop" for negotiation. *See Metro. Life Ins.*, 471 U.S. at 757; *Ford Halifax*, 482 U.S. at 21; *AHLA*, 834 F.3d at 965. The laws at issue in those cases altered the starting points for negotiations but left the parties *free to negotiate with those new starting points in mind*. CGA argues that the Ordinance is different in that it *prohibits* using the mandated premium pay as a backdrop to negotiation because employers cannot reduce compensation or earning potential, *in any way*, to account for the mandatory $4/hour bonus pay. Indeed, if CGA's

interpretation of the Ordinance is correct, it would seem that this Ordinance "affects the bargaining process in a much more invasive and detailed fashion than the isolated statutory provisions of general application approved in *Metropolitan Life* and *Fort Halifax*." *See Bragdon*, 64 F.3d at 502.

Critically, however, CGA has not established a likelihood that its interpretation is, in fact, correct. If the drafters of the Ordinance meant to prohibit employers from offsetting labor costs by lowering any form of compensation "in any way" as CGA suggests, they could have said so in the Ordinance. They did not. Instead, the Ordinance prohibits (1) reducing a worker's wages to offset that worker's premium pay, and (2) reducing a worker's hours to offset the increase in that worker's effective hourly pay. (*See* Ordinance § 5.91.060(A).) Even if the Ordinance does mean something beyond what it says, CGA simply has not shown a likelihood that this is so.

Indeed, the only evidence offered by CGA to support its interpretation is not convincing. CGA merely submits self-serving declaration testimony that at least one of its members "*no longer has the ability to* [1] reject UCFW's premium pay proposal for [its] Long Beach store associates or [2] *bargain a reduction in costs elsewhere in their CBA*." (Decl. of Leroy D. Westmoreland ¶ 8, ECF No. 18-2 (emphasis added).) As to the first part, the Court has already explained why the inability to reject a particular union demand is insufficient to establish preemption. (*See supra*, at 5–6; *see also, e.g.*, *Fort Halifax*, 482 U.S. at 20 (rejecting argument that a state law "intrude[d] on the bargaining activities of the parties because the prospect of a statutory obligation undercuts an employer's ability to withstand a union's demand for severance pay"). As for the remainder, emphasized in the quote above, this self-serving and entirely conclusory testimony does not, on its own, establish the likelihood that the Ordinance truly has this effect.

Moreover, even if section 5.91.060 *could* be interpreted as restricting all facets of a collective bargaining agreement, thereby resulting in preemption, CGA fails to explain why that particular application of section 5.91.060 could not be severed, thereby

leaving the remainder of the Ordinance intact. The Ordinance includes a clear severability provision. (*See* Ordinance § 5.91.150.) "If any clause, sentence, paragraph, subdivision, section, subsection, or portion . . . , *or the application thereof* . . . is held to be invalid, *it shall not affect* the validity of the remainder of this Ordinance, or *the validity of its application to other persons or circumstances*." (*Id.* (emphases added).) Thus, even if section 5.91.060 could be applied in a manner that is preempted by the NLRA, only *that application* of section 5.91.060 would be invalid. By the Ordinance's own terms, *that* preemption "shall not affect . . . the validity of [section 5.91.060's] application to other persons or circumstances." (*Id.*) The Ordinance would still require a $4 premium pay for grocery workers, and it would still prohibit reducing a grocery worker's base compensation or total hours as a result of the Ordinance.

In short, CGA asserts a theory of preemption that would perhaps be plausible, if the Ordinance was drafted differently. However, CGA fails to establish a likelihood that this Ordinance is, in fact, so preempted. Thus, CGA fails to show a likelihood of success on its first cause of action.

**B.     Equal Protection (Second and Third Causes of Action)**

Next, the Court considers whether CGA establishes a likelihood of success on its second and third claims, which are asserted under the Equal Protection Clauses of the U.S. and California Constitutions. (*See* Compl. ¶¶ 31–40.) The Court focuses primarily on the federal standard, as "[t]he equal protection analysis under the California Constitution is substantially similar to analysis under the federal Equal Protection Clause." *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1154 (9th Cir. 2004).

"The Equal Protection Clause directs that 'all persons similarly circumstanced shall be treated alike.'" *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)). "But so too, the Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Id.* (internal quotation marks and brackets omitted) (quoting

*Tigner v. Texas*, 310 U.S. 141, 147 (1940)). "Laws alleged to violate the equal protection clause are generally subject to one of three levels of 'scrutiny' by courts: strict scrutiny, intermediate scrutiny, or rational basis review." *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 543 (9th Cir. 2004). Strict scrutiny applies to laws that "discriminate against a suspect class, such as a racial group, or when they discriminate based on any classification but impact a fundamental right, such as the right to vote." *Id.* (citations omitted). Intermediate scrutiny applies to laws that "discriminate based on certain other suspect classifications, such as gender." *Id.* "All other laws are subject to rational basis review." *Id.* (citing *Fitzgerald v. Racing Ass'n*, 539 U.S. 103, 106–07 (2003)).

Applying this standard to wage laws that target certain classifications of individuals, "[s]ocial and economic legislation . . . that does not employ suspect classifications or impinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate governmental purpose." *Hodel v. Indiana*, 452 U.S. 314, 331 (1981); *accord Long Beach City Emps. Ass'n v. City of Long Beach*, 41 Cal. 3d 937, 948 (1986). But when a state or locality's classifications "disadvantage a 'suspect class'" or "impinge upon the exercise of a 'fundamental right,'" "it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest." *Plyler*, 457 U.S. at 216–17.

Here, CGA contends the Ordinance's classification is subject to strict scrutiny because the Ordinance impinges on a fundamental right otherwise guaranteed by the Contract Clause. (Appl. 8–10.) CGA also argues the classification would fail under a rational basis review. (*Id.* at 11.) In response, the City represents, "[M]ore decisions than can be cited . . . have, without difficulty, concluded that economic and employment related regulations like the Ordinance involve no fundamental right or suspect class and so are analyzed under the deferential rational basis test." (*Id.* (citing, among others,

*Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 407 (9th Cir. 2015); *RUI One Corp*, 371 F.3d at 1154).)

While it is true that myriad cases have applied the rational basis standard when analyzing equal protection challenges against economic legislation, CGA accurately notes that none appear to have squarely addressed the issue presented here. Indeed, whether strict scrutiny applies to a classification that allegedly violates the Equal Protection Clause, *because the underlying law allegedly violates the Contract Clause*, appears to be a novel question. Although it seems implausible that this position is truly unprecedented, neither party cites any authority showing otherwise, nor has the Court uncovered any such case.

Regardless, in this case, CGA fails to convincingly establish why the Ordinance's classification should be subject to strict scrutiny. The Court reaches this determination for a number of reasons. To begin with, the parties do not dispute that "[t]he power to regulate wages and employment conditions lies clearly within a state's or a municipality's police power." *RUI One Corp.*, 371 F.3d at 1150 (quoting *Metro. Life Ins.*, 424 U.S. at 356 ("States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State.")). When that is the case, "[t]he standard for evaluating ordinances claimed to be violative of due process or equal protection is whether a *rational basis* exists for the police power exercised or classification established by the ordinance." *Autotronic Sys., Inc. v. City of Coeur D'Alene*, 527 F.2d 106, 108 (9th Cir. 1975) (emphasis added).

Furthermore, alleged Contract Clause violations committed in the exercise of a municipality's police power are subject to analysis under their own separate framework, which does *not* automatically assume that strict scrutiny applies. *See Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983) (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978)) ("The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected."). Rather, where an exercise of the police power is found to "operate[] as a substantial

impairment of a contractual relationship," the law itself is only subject to strict scrutiny when the nature of the impairment is the most severe. *Id.* Yet CGA suggests that anytime the same law identifies any classification of individuals, the *classification* should be subject to strict scrutiny. The Court seriously hesitates to apply such incongruent standards.

Finally, the mere fact that the Contract Clause appears in the Constitution does not render it a "fundamental right" for equal protection purposes. It is well-established that "[a]lthough the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Id.* at 410 (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934) ("The question is . . . whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end.")). Because "it is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States," *Allied Structural Steel*, 438 U.S. at 241, the Court rejects CGA's argument that the Ordinance's classification must be analyzed under strict scrutiny simply because the clause is found in the Constitution. *See generally Raycom Nat'l, Inc. v. Campbell*, 361 F. Supp. 2d 679, 686–87 (N.D. Ohio) ("Because th[e] right of access is limited and not absolute, the court concludes that it is not explicitly or implicitly guaranteed by the Constitution and thus not a fundamental right.").

Applying, therefore, a rational basis review, the classification set forth in the Ordinance must be afforded "a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993) (internal quotation marks and citations omitted). Here, the classification at issue includes employers with at least 300 employees nationwide and at least fifteen employees per grocery store in Long Beach, whose stores devote at least 70% of their business to retailing food products (i.e., groceries). (Ordinance § 5.91.020.) In other

words, the Ordinance targets large grocery stores, and CGA insists this classification does not have "any relationship" to any of the Ordinance's stated purposes. (Appl. 11.)

The City advances a theory that large grocery stores have reaped significant profits during the pandemic while their employees' wages have remained more or less the same, despite the increased risk of exposure to COVID-19 that grocery workers face. (*See* Suppl. Opp'n 7.) To support this theory, the City submits various news articles reporting on this exact phenomenon, as well as press releases issued by one of CGA's own members regarding its Second Quarter 2020 and Third Quarter 2020 results. (Decl. of Daniel L. Richards ("Richards Decl.") ¶¶ 18–21, ECF No. 21; *see id.* Exs. Q–T, ECF Nos. 21-17, 21-18, 21-19, 21-20.) Notably, those press releases issued by CGA's member (a large grocery store) indicate that "sales grew" by 13.9% in the second quarter and 11.3% in the third quarter of 2020. (*See id.* Exs. S, T.) These facts present a conceivable, rational basis for the classification in question. *See Int'l Franchise Ass'n*, 803 F.3d at 407 ("It is legitimate and rational for the City to set a minimum wage based on economic factors, such as the ability of employers to pay those wages.").

CGA's efforts to debunk this possible rationale fall short. CGA submits its own evidence to suggest that grocery stores have struggled financially since the Ordinance was passed. (*See* Decl. of Brad Williams ("Williams Decl.") ¶ 7, Ex. C, ECF No. 26-2.) Even accepting this as true, it does not make the lawmakers' decision any less rational because at the time the Ordinance was enacted, this fact did not exist. CGA also argues that "[t]he most recently released [data] . . . suggests that California retail workers have *only a mildly elevated mortality risk* relative to the general population." (Reply 19 n.4 (emphasis added) (citing Decl. of William F. Tarantino ¶¶ 2–3, Exs. A–B, ECF No. 26-7).) This is not convincing either, as a mildly elevated mortality risk is *still* an elevated mortality risk, and the City could have rationally decided to compensate grocery workers for taking on such risk by showing up for work. Moreover, "a legislative choice is not subject to courtroom fact-finding and may be based on rational

speculation unsupported by evidence or empirical data." *RUI One Corp.*, 371 F.3d at 1155 (quoting *Beach Commc'ns*, 508 U.S. at 315). Indeed, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id.*

Finally, to the extent that CGA complains of lawmakers' decision to target large grocery stores as opposed to all grocery stores or all essential retail businesses, (*see* Appl. 7, 12–13; Reply 15–17), "[s]uch legislative decisions are 'virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally,'" *RUI One Corp.*, 371 F.3d at 1155 (quoting *Beach Commc'ns*, 508 U.S. at 316 ("The legislature may select one phase of one field and apply a remedy there, neglecting the others.")).

"Whether the legislation is wise or unwise as a matter of policy is a question with which [the Court is] not concerned." *Blaisdell*, 290 U.S. at 447–48. Rather, the Court's "role is at an end once [it] can say that the view chosen by the City council is not irrational." *Autotronic Sys.*, 527 F.2d at 108. Here, the Court finds a rational basis does exist for the Ordinance's classification. Thus, CGA fails to show a likelihood of success on its Equal Protection Clause claims.

### C.     Contracts Clause (Fourth and Fifth Causes of Action)

Finally, the Court considers whether CGA has established a likelihood of success on its Contract Clause claims. (*See* Compl. ¶¶ 41–47.) Again, the Court focuses on the federal standard, as "[t]he California Supreme Court uses the federal Contract Clause analysis for determining whether a statute violates the parallel provision of the California Constitution." *Campanelli v. Allstate Life Ins. Co.*, 322 F.3d 1086, 1097 (9th Cir. 2003) (citing *Calfarm Ins. Co. v. Deukmejian*, 48 Cal. 3d 805 (1989)).

As already mentioned, the Contract Clause "does not prevent the [city] from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected." *Allied Structural Steel*, 438 U.S. at 241

(quoting *Manigault v. Springs*, 199 U.S. 478, 480 (1905)). The Supreme Court has also noted, though, that "[i]f the Contract Clause is to retain any meaning at all . . . it must be understood to impose *some* limits upon the power of a [city] to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." *Id.* (quoting *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 22 (1977) ("Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption.")).

Thus, the Supreme Court has established a three-step test for determining whether the Contract Clause has been violated by an otherwise valid exercise of police power. First, "[t]he threshold inquiry is 'whether the [city] law has, in fact, operated as a substantial impairment of a contractual relationship." *Energy Rsrvs. Grp.*, 459 U.S. at 411 (quoting *Allied Structural Steel*, 438 U.S. at 244). "The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." *Id.* (citing *Allied Structural Steel*, 438 U.S. at 245). "Total destruction of contractual expectations is not necessary for a finding of substantial impairment." *Id.* (citing *U.S. Trust Co.*, 431 U.S. at 26–27). "On the other hand, [city] regulation that restricts a party to gains it reasonably expected from a contract does not necessarily constitute a substantial impairment." *Id.* (citing *U.S. Trust Co.*, 431 U.S. at 31). Furthermore, when applicable, courts must "consider whether the industry the complaining party has entered has been regulated in the past." *Id.* (citing *Allied Structural Steel*, 438 U.S. at 242 n.13).

Second, "[i]f the [city] regulation constitutes a substantial impairment, the [city], in justification, must have a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem." *Id.* (internal citations omitted). Although it may, "the public purpose need not be addressed to an emergency or temporary situation." *Id.* The principle underlying this step is to "guarantee[] that the [city] is exercising its police power, rather than providing a benefit to special interests." *Id.*

Third, "[o]nce a legitimate public purpose has been identified, the next inquiry is whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Id.* (internal quotation marks and brackets omitted). "Unless the [city] itself is a contracting party, as is customary in reviewing economic and social regulation, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id.* (internal quotation marks, citations, and alterations omitted) (quoting *U.S. Trust Co.*, 431 U.S. at 22–23).

Here, CGA fails to establish a likelihood of success on its Contract Clause claims. To start, CGA fails to identify any terms of the allegedly impaired contracts. The Court cannot determine whether the Ordinance "substantially impairs" the contractual relationships between CGA's members and their workers without knowing the nature of those relationships. Similarly, the Court cannot determine what level of scrutiny to apply in analyzing the Ordinance if it cannot determine the severity of the alleged impairment.

Moreover, CGA *does not assert* a likelihood of success on its Contract Clause claims. Instead, CGA tries to shoehorn a Contract Clause analysis into its Equal Protection Clause analysis. (*See* Appl. 7–13 (discussing Contract Clause issues but limiting conclusion to likelihood of success on Equal Protection claims); Reply 8–17 (same).) By mashing the two analyses together, CGA distorts the Equal Protection Clause framework in an attempt to impose strict scrutiny on the Ordinance in the Contract Clause context. (*See* Part IV(B), *supra*.) However, these are two separate inquiries, and CGA fails to establish a likelihood of success on either.

Even if, *arguendo*, the Ordinance does substantially impair the contractual relationships between CGA's members and the City, CGA fails to establish a likelihood that the Ordinance would not survive the second and third steps of the analysis. In fact, CGA skips the second step altogether regarding the *existence* of a legitimate purpose, instead arguing only that the identifiable purposes are not advanced by the Ordinance.

(*See* Appl. 11–12.) With respect to the third step, CGA argues that the Ordinance "does not protect or promote public health" because "a wage bump does not mitigate the risks of exposure to a virus." (*Id.* at 11.) Indeed, this is a fair point, and the Court is inclined to agree. That does CGA little good, however, because CGA utterly fails to address why the Ordinance is not an appropriate means for achieving its other stated purposes (e.g., fairly compensating grocery workers for the hazards they encounter as essential workers).

The Court's decision today is limited. It does not purport to reach whether the Ordinance violates the Contract Clause. Perhaps an argument could be made that it does. What matters for now is that CGA has not shown a likelihood that this is the case.

## V. CONCLUSION

In summary, CGA fails to establish a likelihood of success on any of its claims. Thus, the Court need not consider the remaining *Winter* factors. CGA's motion for a preliminary injunction is **DENIED**. (ECF No. 18.)

**IT IS SO ORDERED.**

February 25, 2021

```
                    _____
                         OTIS D. WRIGHT, II
                    UNITED STATES DISTRICT JUDGE
```